[Civ. No. 2087.   Fourth Appellate District.—March 28, 1940.]

DOROTHY SEBASTIAN, Plaintiff and Appellant, v. GEORGE CROWLEY, Defendant and Appellant.

William M. Rains and Fred Kunzel for Plaintiff and Appellant.

Herbert C. Kelly for Defendant and Appellant.

GRIFFIN, J.—This is an action for malicious prosecution. The case was tried before a jury which returned a verdict in favor of the plaintiff Dorothy Sebastian in the amount of $10,000 against the defendant George Crowley. The jury also returned a verdict against the plaintiff in favor of the defendant C. D. Calkins, who was an employee of the defendant George Crowley. No appeal was taken from this judgment in Calkins' favor. Motions in behalf of the defendant George Crowley to vacate the judgment, to order entry of judgment in his favor, and for judgment notwithstanding the verdict were denied. From these orders, as well as from the judgment, defendant Crowley has appealed. A motion for a new trial in behalf of the defendant George Crowley was granted, from which order plaintiff has appealed.

The appellant Dorothy Sebastian urges that the trial court abused its discretion and committed error in granting the new trial because there was no justification for it either in the law or on the facts and argues that the court stated no grounds in its order granting the new trial, and contends that it is to be presumed therefore that it was not granted upon the ground of insufficiency of the evidence; that there were no errors of law; and that there was no justification on that ground for the order.

Appellant Crowley contends that the judgment against him should be reversed and that he was entitled upon the evidence,

as a matter of law, to a directed verdict or judgment notwithstanding, and that the verdict and judgment in favor of his codefendant and alleged agent necessitated a judgment for the appealing defendant and that the trial court's order granting a new trial should be affirmed.

The amended complaint herein charges that "C. D. Calkins, *acting on behalf of the other defendants herein*", swore to a criminal complaint charging plaintiff Dorothy Sebastian and one Sam Hoffman jointly with the crime of defrauding an innkeeper. This is the only overt act charged and is the sole basis for the present action. No conspiracy is charged.

During the course of the trial the suit was dismissed as to all defendants excepting C. D. Calkins and George Crowley. The complaint therefore apparently alleges liability of Crowley for this act as principal of his agent Calkins. Defendant Crowley counterclaimed and cross-complained for $103.31. Several written interrogatories were submitted to the jury for determination and were answered.

It was stipulated "that inasmuch as cross appeals have been filed . . . that said appeals may be deemed consolidated for hearing . . . and that a single reporter's transcript may be used for both of said appeals".

A brief synopsis of the evidence discloses that on January 20, 1937, one Sam Hoffman, a theatrical producer, came to the New Plaza Hotel in San Diego and had a conversation with the defendant and respondent, George Crowley, who was the lessee and proprietor of the hotel, and the defendant C. D. Calkins, who was an employee of Crowley and the chief clerk of the hotel. Hoffman stated to Crowley and Calkins that he was producing a show called "Top Billing" and was going to give a performance of the show in San Diego for the benefit of the Red Cross flood relief. He further stated that the plaintiff and appellant, Miss Dorothy Sebastian, was going to be the star. At this time arrangements were made between Crowley, Calkins, and Hoffman for hotel accommodations for the troupe, but the rates were left open because Hoffman did not know how many would double up and how many would have separate rooms. Hoffman further stated that he would be responsible for the hotel bill. At this same conversation there was some discussion as to the troupe taking their meals at the Savoy Cafe, a near-by eating place,

Subsequent to this first meeting, Hoffman told Crowley that before the troupe came to town he would put up enough money to cover their entire bill. The defendant Crowley testified that he discussed with Hoffman nearly every day the question of when he was going to pay the money for the accommodations for the troupe. Miss Sebastian was to appear in the play for the benefit of the Red Cross and to acquire or regain self-confidence, as she did not feel that she was ready to go back into pictures, she having been away from the screen so long she needed experience to give her self-assurance. She was to receive no remuneration for her appearance. Miss Sebastian arrived in San Diego with another member of the troupe. She was greeted in the lobby of the hotel by Mr. Crowley. She was shown to her room and did not sign the hotel register. At that time and in Mr. Crowley's presence, she was told by Mr. Hoffman that arrangements had been made for the company to eat at the Savoy Cafe and all they had to do was sign "Sam Hoffman, Top Billing".

The next evening Mr. Crowley came up to Miss Sebastian's room and there had a conversation with Miss Sebastian and other members of the troupe. Subsequently there was a discussion as to how the members of the troupe should double up in the rooms of the hotel. During this discussion Miss Sebastian wrote on the back of the telephone book the names of the members who were to pair off. The show was billed to go on Sunday night but was postponed until Monday night, February 8th. The show was a financial failure.

On Tuesday morning Miss Sebastian called a bell boy and had him take her baggage downstairs into the lobby of the hotel where she had a conversation with Mr. Calkins in Mr. Crowley's presence. Miss Sebastian stated that she wanted to pay her personal bills. There was shown to her a statement as follows: "Room rent $61.50; telephones and telegrams $12.17; laundry $1.05; Dr. Holden $5.00; Savoy Restaurant (meals) $21; misc. and cash advanced $2.59"; totaling $103.31. She paid a portion of the telephone charges on the bill and her garage bill. Mr. Calkins showed her a number of other bills and stated that Mr. Crowley had requested that he show them to her. Her baggage was being taken out by the bell boy during the above conversation and placed in her car which

had been brought by the hotel service to the front door of the hotel. At that time there was some further conversation in which Miss Sebastian stated that she would try and see that Mr. Hoffman made an honest effort to pay the bill. Mr. Hoffman never returned from the theatre after the show nor did he leave any baggage at the hotel.

The registration card which was kept by the hotel for Miss Sebastian showed that the charge for her *room*, 501, was charged to room 329, which was Hoffman's room number.

On February 12, Mr. Crowley sent the following letter to Miss Sebastian at Hollywood:

"Dear Miss Sebastian:

"The matter of your account and that of the Company was taken up by the Committee of Stockholders who represent the owners of the New Plaza Hotel with their attorney and they state that all telephone messages coming from your room should be charged to you, all meals charged by you should be paid by you; that Hoffman agreed to deposit the amount of the rooms with the hotel before the Company arrived, which he did not, . . . and that you called the manager to your room and asked him what arrangements were made for rooms for the Company, and that you arranged for their doubling up. We have the telephone book where you wrote the names of the Company and stated how many rooms you would require and that everything would be O. K. You also ordered a doctor for Hoffman and charged same to us. We are willing to waive the room rent but insist on the $50 cash we paid out. If it is not paid we will ask the district attorney for a warrant for defrauding an Inn Keeper by Monday, February 15, 1937.

"NEW PLAZA HOTEL.

(Signed) "GEORGE CROWLEY,

"Manager."

Immediately on receipt of the letter Miss Sebastian telephoned Mr. Crowley from Los Angeles and told him that Hoffman and not she was responsible for the hotel bills. Crowley was the proprietor and directed the writing of the letter. On February 19th, Mr. Crowley consulted Mr. Whelan, the then district attorney of San Diego County. Mr. Whelan testified that:

''The circumstances of the complaint made to me about the hotel bill of either Mr. Hoffman or Miss Sebastian, or both, were these. Mr. George Crowley called at my office. . . . After Mr. Calkins had brought the bill down, and I had decided to issue a complaint against both Miss Sebastian and Mr. Hoffman or either of them, to be turned over to whoever might try the case, I dictated . . . a brief statement of facts. . . . My best recollection of my conversation with Mr. Crowley on that day is that he told me that Mr. Hoffman, had come down to see him, and he had not known Mr. Hoffman at all; . . . and stated that he and Dorothy Sebastian were putting on a show called 'Top Billing'; that they had made arrangements to produce the play in Los Angeles at the Biltmore, . . . ; that Warner Brothers' studio was interested in the play to the extent that they were going to have a representative there to see how it went over, and if it went over well, that Warner Brothers were going to make a picture out of it, and star Miss Sebastian. . . . Mr. Crowley told me that the show had not proven successful, and that during the night Mr. Hoffman had left and removed his baggage, and presumably took the midnight . . . train to Los Angeles. That the next morning Miss Sebastian came down and refused to pay for anything except two personal long distance calls she had made, and she left; they owed him something around $100, . . . ; that he had made an attempt to contact Miss Sebastian and had contacted her in Los Angeles and she refused to pay the bill; that he could not get any satisfaction out of Mr. Hoffman; and he put the proposition up to me 'What can I do about it?' . . . He said he understood that the law protected him, and what about it? So I asked him quite a few questions. He said he had not known Hoffman previously and knew Miss Sebastian only by name and reputation; that if Mr. Hoffman had come in with a proposition of the kind he had put to him, without having people of a recognized name appearing in the show, that he would not have extended him any courtesies, would not have let him stay at the hotel without paying his bill. He said he expected that he would have his money from Miss Sebastian when the show proved a flop, and that it looked to him as though they were trying to exonerate Miss Sebastian, making Mr. Hoffman pay the money, but that Hoffman apparently did not have any. . . . I asked

him to let me think it over and to send Mr. Calkins down . . .
Mr. Calkins came down the next day and brought the itemized bill which has been introduced in evidence here. . . . I
. . . had the chief clerk draw a complaint, and at that time
I had Mr. Calkins sign the complaint. First I thought I
would have Mr. Crowley sign it, but Mr. Calkins was there
when we issued the complaint and he signed it. The complaint was signed by Mr. Calkins at my direction. I took
into consideration a good many things. I took into consideration my independent knowledge as to the publicity connecting
Miss Sebastian with this show. I also took into consideration
the fact that Miss Sebastian had eaten meals that were furnished by the Savoy Cafe and which were charged to the
hotel, most of the week before. I assumed that Miss Sebastian would have been responsible for the meals which she had
received. I also took into consideration the fact that it looked
to me as though both Mr. Hoffman and Miss Sebastian were on
a joint venture in the production of this show. Miss Sebastian, if the show proved successful, had quite a bit to gain;
Mr. Hoffman had told Mr. Crowley, so Mr. Crowley told me,
that Mr. Bill Boyd, formerly married to Miss Sebastian, was
quite interested in seeing her back in the pictures. It looked
to me as though she must have known Mr. Hoffman's circumstances, financially, and entered into the deal with him to come
down here when the cast was put up at this hotel; and taking
into consideration section 31 of the Penal Code which makes
all persons who directly commit a crime or aid or abet in its
commission, principals, I figured she was responsible . . . Mr.
Crowley did not at any time request that a criminal complaint
be issued against Miss Sebastian, neither did Mr. Calkins.
I think that both left it up to me . . . Mr. Crowley told me he
did not think it right that people should beat him out of a
hotel bill, and left it up to me. There was no suggestion made
in the course of either of these conversations, or otherwise,
either by Mr. Crowley or by Mr. Calkins as to the form of
complaint which should be drawn. . . . I understood they
had written to Miss Sebastian . . . I don't believe that he
said he had written to her threatening to have her arrested
for failing to pay the bill, but that would not make any difference. If I thought she owed the bill I would have issued
the complaint . . . Most of this statement is largely my own

conclusion based upon what they told me. It is supposed to contain the facts as I understood them, based upon what I was told . . . I caused the complaint to be issued upon the facts which I was told, and the feeling I had that the two were jointly responsible, and it would not do to permit Miss Sebastian to be absolved of responsibility, and let Hoffman, who probably would never pay, be responsible for the bill. My conclusion was based upon the statements Mr. Crowley and Mr. Calkins had given me and to a certain degree by the manner in which the thing was advertised, and in a measure by my own idea about what was the right and wrong of the thing. The only tangible facts were those given me by Mr. Crowley and Mr. Calkins, and seeing the handbill and advertisement featuring Miss Sebastian in the show . . . I caused the complaint to be issued upon those facts and my feeling that it was the proper thing to do. My feeling arose from their statement of facts and the construction that I placed upon those facts . . . ''

Mr. Calkins' testimony in reference to the signing of the complaint is: ''I signed the criminal complaint at the request of District Attorney Whelan; . . . Mr. Crowley did not ask me to sign the complaint . . . I testified in my deposition that no one advised me to sign this complaint; that Mr. Crowley asked me to go to the District Attorney's office and sign this complaint . . . In my interview with Mr. Whelan I did not consciously conceal any fact known to me. I did not conceal anything.''

Mr. Calkins' testimony, as well as the testimony of Mr. Crowley, while containing some variations as to the happenings, did not materially differ from the statement related by the district attorney.

A criminal complaint was sworn to February 19, 1937, by Mr. Calkins. The warrant for arrest of Miss Sebastian and Hoffman was issued on the same date. The Los Angeles papers contained several articles about the issuance of the complaint. Miss Sebastian testified she read these articles and surrendered herself and posted bail. After trial of the case, on motion of the defendant Miss Sebastian, the court dismissed the case as to her ''for lack of evidence to support the complaint''. Subsequently defendant Hoffman, after forfeiture of bail and issuance of a bench warrant, stood trial

and was convicted. This action by Miss Sebastian for malicious prosecution followed.

We will first consider the appeal from the order denying defendant Crowley's motion for judgment notwithstanding the verdict. ■ It has been repeatedly held that the question of what facts or circumstances amount to probable cause is a pure question of law for the court (*Booraem* v. *Potter Hotel Co.*, 154 Cal. 99 [97 Pac. 65]; *Holliday* v. *Holliday*, 123 Cal. 26 [55 Pac. 703].) The jury may be called upon to determine whether such facts and circumstances exist when there is a substantial conflict in the evidence bearing upon this issue, but in the absence of any substantial conflict in such evidence it is the province of the court to determine whether such facts and circumstances do or do not establish a want of probable cause (*Moore* v. *Durrer*, 127 Cal. App. 759 [16 Pac. (2d) 676]; *Johnson* v. *Southern Pac. Co.*, 157 Cal. 333 [107 Pac. 611].) In the present case we find no substantial conflict in the evidence relating to the issue of probable cause. ■ It may be stated that actions for malicious prosecution are not favored in the law (*Dunlap* v. *New Zealand F. & M. Ins. Co.*, 109 Cal. 365 [42 Pac. 29]; 16 Cal. Jur., p. 737, sec. 9.) The reasons therefore are based on considerations of public policy and are set forth in the authorities cited. ■ In order to sustain such an action it is well settled that the burden is upon the plaintiff to establish two indispensable elements, first, that the defendant acted without probable cause; and second, that defendant was actuated by malice. (*Griswold* v. *Griswold*, 143 Cal. 617 [77 Pac. 672]; *Davis* v. *Pacific Tel. & Tel. Co.*, 127 Cal. 312 [57 Pac. 764, 59 Pac. 698]; *Carpenter* v. *Ashley*, 15 Cal. App. 461 [115 Pac. 268].)

■ Probable cause has been defined as "a suspicion founded upon circumstances sufficiently strong to warrant a reasonable man in the belief that the charge is true". (*Johnson* v. *Southern Pac. Co.*, supra; *Lee* v. *Levison*, 173 Cal. 166 [159 Pac. 438].) It is also clear that existence of probable cause is not negatived merely by a showing that no crime was committed or that the accused is innocent (*Sylvester* v. *Kennedy*, 137 Cal. App. 250 [30 Pac. (2d) 63]; *McKenna* v. *Heinlen*, 128 Cal. 97 [60 Pac. 668]; *Haydel* v. *Morton*, 8 Cal. App. (2d) 730 [48 Pac. (2d) 709]), and although an action for malicious prosecution may not be maintained unless it is

shown that the proceedings alleged to have been prosecuted maliciously and without probable cause have been terminated in favor of the party claiming to be injured thereby, a mere showing of such favorable termination is, of course, totally insufficient under the authorities above cited. In fact, evidence of such favorable termination does not even create a conflict on the issue of probable cause. (*Moore* v. *Durrer, supra.*)

██ We have set forth a fair *résumé* of the evidence bearing on that question. From that summary of the undisputed evidence, we are convinced that defendant's contention that there was probable cause for the prosecution of plaintiff must be sustained. It is quite apparent that defendant Crowley made a full and fair statement of all the information he possessed, and acting upon the advice of the district attorney, plaintiff was made a party to the criminal complaint. It should be noted also that the district attorney acted not only upon the information given by defendants but upon additional independent knowledge of his own.

It was said in *Richter* v. *Neilson,* 11 Cal. App. (2d) 503 [54 Pac. (2d) 54] : ''that if in addition to his own belief a defendant proves that before commencing the prosecution of the action alleged to be malicious he sought the legal advice of an officer selected by the people to prosecute offenders against laws and in good faith fully and fairly disclosed to that officer all of the information he possessed and was then advised that a crime had been committed and the prosecution is based upon a complaint prepared by that officer he has made out a complete defense to the action (citing cases), however erroneous the advice may have been. (*Potter* v. *Seale,* 8 Cal. 217, 218, 226 ; 18 R. C. L. 45.) ''

(See, also, *Garfield* v. *Peoples Finance & Thrift Co.,* 24 Cal. App. (2d) 144 [74 Pac. (2d) 1061].)

The burden of proving malice and want of probable cause rests on plaintiff. To sustain this burden she must prove that the complaining witness did not have reasonable grounds for believing that the material facts alleged in the criminal complaint were true. The evidence, it seems to us, clearly establishes that the defendant instituted the prosecution in good faith and on advice of counsel, thus bringing the facts within the rule laid down in *Richter* v. *Neilson, supra.* Under

the evidence presented the trial court should have granted the motion for judgment notwithstanding the verdict and entered judgment for the defendant George Crowley.

In view of this determination we see no necessity in passing upon the appeal from the order granting the new trial. However, had the motion for judgment notwithstanding the verdict not been made, we would have been impelled to uphold the trial court's order granting a new trial, at least for the reasons stated, if for no other additional reason.

In view of this conclusion it is ordered that the order denying the motion for judgment notwithstanding the verdict be reversed and the trial court is ordered to enter judgment for the defendant George Crowley notwithstanding the verdict, and against the said George Crowley on his cross-complaint. Therefore the order granting a new trial is reversed. All other attempted appeals are dismissed. (*Estate of Siemers*, 202 Cal. 424 [261 Pac. 298].)

Barnard, P. J., and Marks, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on April 27, 1940, and an application by plaintiff and appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on May 27, 1940. Carter, J., Gibson, J., and Peters, J., *pro tem.*, voted for a hearing.