[S. F. No. 17186. In Bank. Dec. 14, 1945.]

LOUISE ZIEGLER, Appellant, v. JULIETTE REUZE, Respondent.

Samuel D. Hamburg for Appellant.

J. B. Zimdars for Respondent.

SCHAUER, J.—In this malicious prosecution action, plaintiff appeals from a judgment rendered by the court, without a jury, by which it is decreed that plaintiff recover nothing. The trial court, on sufficient evidence, found in favor of defendant on all contested issues. Plaintiff's chief contention on appeal is that the court received and considered certain evidence which was not properly admissible. We have concluded, however, that such evidence as may not have been properly before the court was not, in the light of all the evidence and the findings, materially prejudicial to plaintiff's case and that the judgment must be affirmed.

As disclosed by the record, the facts which gave rise to the controversy are substantially as follows: On September 26, 1942, defendant Juliette Reuze swore to a complaint charging that on or about September 16, 1942, plaintiff Louise Ziegler committed the misdemeanor of disturbing the peace. On October 2, 1942, the complaint was dismissed by a judge of the municipal court and on October 17, 1942, this action was filed.

The "international character" of the controversy was stressed in the trial court. Plaintiff and her husband, Christopher Ziegler, of Austrian extraction, and defendant, who is a Frenchwoman, and her husband, Peter M. Reuze, also French, had since 1937 resided as neighbors in the vicinity of Golding Alley and Corbett Avenue in the city of San Francisco. Also resident in the neighborhood, in a house on a lot which adjoined on one side a lot owned by the Reuzes and on the other side a lot owned by the Zieglers, were the Ruffonis, apparently of Italian descent, and the Kellys, who, it seems to have been inferred, are Irish. The home occupied by the

Reuzes adjoined the west side of a vacant corner lot owned by the Zieglers. The house in which the Zieglers resided was some 125 feet north of such vacant lot.

Plaintiff testified that between 6 and 7 o'clock in the evening of September 15, 1942, her husband went from their home to the vacant corner lot to secure some tools he had left there after working on the lot in the afternoon; that shortly thereafter plaintiff, who had remained at home, heard her husband calling her name; that she ran out to the sidewalk and from there saw her husband "coming around the corner. Mrs. Reuze, the defendant [whose measurements are not reflected in the record], was hanging on to my husband [who admitted 6'2" of stature] and pulling him back; and my husband tried to get away but she held him back; and there was an Arthur Kelly that had a big pot in his hand aiming for my husband's head"; that plaintiff "called to my husband to come in the house, and that Mrs. Reuze, the defendant, was still hanging; but my husband jerked loose and, at the same time, I saw Pete Reuze, her husband, flying around the corner and he had a gun—it looked like a machine gun—and he said, . . . 'I will blow your God damn head off, you dirty skunks. I am going to kill you both,' and he was aiming at me, and I was standing by my house, and I said nothing, I said. And she, the defendant, said, 'You dirty skunks, you dirty skunks, you dirty skunks, and I will kill you, you dirty sons of bitches,' and Mr. Kelly said, 'Who's a dirty skunk?' And he was the man with the pot"; that Mr. Ziegler then walked home, he and plaintiff went into their house and plaintiff called the police; that at no time was plaintiff closer than 75 feet to the group she claimed was pursuing her husband; that a few days after September 15 plaintiff and her husband "went to the District Attorney's office for a warrant [for Pete Reuze and his wife], and he talked us out of it"; that on September 26, 1942, pursuant to a citation she had received she went again to the district attorney's office where were already gathered (among other residents of the neighborhood) the Reuzes, the Kellys, and Mrs. Ruffoni, "those people that we reported for violating a City ordinance"; that the district attorney then "said that Mr. Ziegler couldn't be disturbing the peace because he is working, he is never home; and the defendant she said, 'Mrs. Ziegler is the one. She is disturbing the peace,' and . . . he said 'I will have to give a warrant against Mrs. Ziegler' so he did"; that plaintiff was thereupon booked at the City Prison

and held in custody outside a cell until she furnished bail, a period of approximately one hour; that the police were "very courteous" to her.

Touching upon the subject of specific incidents with the neighbors, her relationship with them and theirs to her, plaintiff, in reply to the question "And you were friendly with all the other neighbors [other than the Reuzes]?" volunteered the statement that prior to the disturbance of September 15, 1942, she and her husband "had nothing to do with any" of their neighbors, but had for various reasons reported "seven or eight" of them to the Board of Public Works. She also testified that she had complained to the Board of Health concerning "the Tounseleys"; that Mr. Sheehy had "violated a city ordinance"; that she "never had nothing to do with Mrs. Sheehy"; that she [plaintiff] had written "the Board of Public Works if they would be kind enough to open up that public lane" across property owned, or claimed to be owned, and occupied by the Reuzes; and that she (plaintiff) and her husband by means of reports and representations made by them had "got [Arthur Kelly, 'the man with the pot'] off Relief some years ago." She was asked, "How many neighbors were there that you had trouble with?" and answered, "It is all the people picking on us." Concerning the neighbors who were appearing as witnesses for the defendant, plaintiff stated, "She [defendant Mrs. Reuze] had those people along [at the conference at the district attorney's office] that she has today, that we reported for violating a City ordinance, Arthur Kelly and Mrs. Kelly, and Mrs. Ruffoni—people making continuous trouble for us because we improved up there [among other things, it was testified by some of the witnesses, the "improvements" included a galvanized iron spite fence eight to twelve feet high and painted black] and they don't want improvements."

Some of the testimony above set forth was adduced on direct examination, some of it on cross-examination, and much of it was volunteered by the witness. Regardless of whose questioning was the basis for any particular statement no effort was made by or on behalf of plaintiff to exclude from the record *her* version of various incidents with the neighbors. It is, however, the testimony of the neighbors concerning these same or related matters, first alluded to by plaintiff herself, that plaintiff contends was improperly admitted.

Peter Reuze, defendant's husband, stated that on the

evening in question, September 15, 1942, "After I got through working, the wife told me that those people were putting up stake posts to erect a fence; so I went down the lane and I saw a big railroad tie sticking up on the wall, and I didn't pay attention to it, and I was looking to see if it was on my ground, and I didn't see nothing; and I saw Mr. Ziegler come from behind and he grabbed me by the neck, and said, 'What in the hell are you looking at, you little son-of-a-bitch.' Anyway, he grabbed me by the neck and dragged me to the sidewalk, and I started to holler to have witnesses, and then the wife came, Mrs. Ruffoni came, and folks living up above, who was Mrs. Kelly, Mr. Kelly, and I don't know, possibly Mrs. Williams heard the commotion, and may have heard something; but anyway, I had those people there, and when they saw—Mrs. Kelly saw what was going on—I don't know how far away, but she called the Police and the Police came after it was all over, because those folks came, the wife, Mrs. Ruffoni, and Mr. Kelly, Mrs. Kelly were there, and when the wife saw he had me by the neck, she came to separate the two of us and then he got a hold of her, and pushed the two of us in the middle of the street, and here were machines coming around behind, and I was hollering, 'Here's a machine!' . . . And after that we managed to get loose, or, he released his grab on us, and the machines missed us by maybe three feet is about all I can see, and after that he was hollering for Louise—Mrs. Ziegler; and she came down, and she said, 'Christopher, come on home, and leave those two sons-of-bitches alone,' and she didn't pay no more attention; and here comes a police wagon, a sedan, and the officer said, 'Oh, well, we know those people. We had trouble before. Nobody got hurt. Forget about it. We came over because we were sent over,' and he said 'That's why we came here,' and that was that particular case.

"Your Honor, may I say something else? I have been pestered by those people all along. They said I am the 'machine gunner' and they have sent the FBI up. . I have no objection for anybody to investigate me on my actions, but it seems on different occasions that those people have persecuted me on having machine guns. . . . I don't even own an air rifle. . . . I have no weapon"; that prior to September 15, 1942, Mr. Ziegler had not annoyed the witness, "but he said to us, 'If you keep'—they had trouble with somebody else before—with Mrs. Ruffoni at that time—and they were talking

to us—we didn't take sides, we tried to keep neutral on what may arise, and they said 'If you keep on talking to the Ruffonis we are going to make it mean for you.' . . . and we kept on talking to Mrs. Ruffoni, because we have known her a good many years, she is a good neighbor, and those people, we were friends with them when they first came . . . and we didn't have a word with them until they started complaining about Mrs. Ruffoni. . . . That's quite a while before this when they started to have trouble with Mrs. Ruffoni. Every time they would see her they would say, 'How is Lena,' they said, 'the wop, the son-of-a-bitch.' . . . [O]n one . . . afternoon I was cutting some rose bushes in the yard, and the wife was · going to see Mrs. Ruffoni, and Mrs. Ziegler was at that time in her lot, and she started to call my wife, call her names— she called her a dirty French whore, and that's exactly the words she used. . . . And I was so upset that I went back alongside, and I called to her and I said, 'Mrs. Ziegler,' I said, 'what did you call my wife?' She said, 'You son of a bitch, you come over here and I'll fix you,' and she was brandishing a hammer, and I said, 'I will give you the first crack at me, if you feel that way about it, you and your hammer,' I was upset and she cooled off and went back to her work, and I forgot about the darned thing. And I always said to the wife, 'There is only one way to keep those people quiet, and that is to go to court'. Nobody wanted to go to court, so I advised the wife to put those people under a peace bond, and that is why she went to court, to put those people—with all the neighbors present, and some are missing now—under a peace bond at the bond office.''

Defendant's story of the events of September 15, 1942, is as follows: ''On the 15th of September 1942, Mr. Ziegler put up posts on the ground [of the vacant lot adjoining the Reuze home] and when my husband come home at night, I told him about it, and my husband went down and Mr. Ziegler grabbed him by the neck and started to fight, and I hear him hollering, 'Help, help,' Mrs. Ruffoni come down. She was in the house and she come down and we went to see what happened. Then Mr. Ziegler grabbed—he had my husband by the neck—and I went after Mr. Ziegler to grab him and Mr. Ziegler had both of us, and he tried to put us on the street. A machine was coming, and all our neighbors, Mrs. Kelly, Mr. Kelly was there, and Mrs. Ruffoni, and Mrs. Williams—she was above us—come down and try to help us. They were putting us in

the street, and Mr. Ziegler wanted, I think, both of us to be killed. Then Mr. Ziegler let us go—he grabbed both of us—and he was going for his wife, by the name of Louise, and when she come out she used language that was something fierce. . . . She said, 'You God damned dirty French whore. You old soak.' And I was never once intoxicated in my life. And I went home''; *that one of the neighbors then called the police, who advised that the Zieglers be put under a peace bond;* that thereupon she, defendant, consulted the district attorney in his office and at his request returned to his office on September 26, 1942, accompanied by several of the neighbors; that when they arrived at his office ''Mr. and Mrs. Ziegler was there. He asked me again my case, and I started to say what he [Ziegler] did to my husband, and what she [Mrs. Ziegler] called me, and the District Attorney asked to say what those people did, and they started in to say, but she [Mrs. Ziegler] was so mean, she don't want us to say to the District Attorney . . . Then he [the District Attorney] . . . said [to Mrs. Ziegler], 'You shut up, you are just looking to fight,' and he said, 'Who are those people?' And I said 'The people who come and testify' and when we start to talk, she don't give us a chance to talk, and she [the plaintiff, Mrs. Ziegler] said, 'I want everybody to be arrested in this room.' Then the District Attorney just . . . said, 'There will be only one, and it will be you.' Then he passed me a sheet of paper and wanted me to sign, and I said 'Why?' And he said, 'She's a nuisance. She ought to be arrested' and I said, 'What we want, those people—we all come together and we want those people to be under a peace bond. We want to be left alone, like we were before. If we talk in the street, we don't want them to call us names.' ''

Julia Sheehy, Elinor V. Knuth, Mabel Kelly, and Leone Saran, all of them neighbors of the parties, were also present in the district attorney's office when, at his direction, defendant signed the complaint against Mrs. Ziegler, and corroborated defendant's story of the events which occurred there. Mrs. Saran testified in particular that on ''the date that this complaint was sworn out, I came down with Mrs. Reuze and we were talking to the District Attorney about the complaint, and Mr. and Mrs. Ziegler butted in so many times trying to tell their side of the story, that the District Attorney got sick and disgusted and he said, 'I am sick of you, with your water pistols and popguns. I will swear a complaint on general

principles, because you are both a nuisance.' . . . He said, 'I am sick and tired of your popguns and complaints for the different tenants that live on Corbett Avenue.' Q. And he advised Mrs. Reuze to sign this complaint that is the subject of this action? A. Yes. Q. And she did it after a full statement of all the trouble by you. people and by the Zieglers made to the District Attorney at the Hall of Justice? A. Yes.''

These four neighbors also testified to various specific instances and manners in which plaintiff and her husband had interfered with and attempted to supervise the lives and living conditions of the witnesses (while they resided in the neighborhood) by complaints to the Board of Health and the city building inspectors and in the case of the Kellys by taking steps to secure the discharge of Mr. Kelly from his WPA employment. Further testimony to the same general effect was given by defendant's husband. It is to be noted that such testimony by three of the four neighbors and by Mr. Reuze concerned matters which had already been covered generally by the plaintiff in her own testimony. The testimony of Mrs. Saran, the fourth of the neighbors above mentioned, was received out of order, prior to plaintiff's cross-examination, but after plaintiff had testified concerning the action she had taken to procure the discharge of Mr. Kelly. The nearest approach to an objection to the testimony of this witness (other than an objection to a conclusion, which was sustained) is found in a remark of plaintiff's attorney (interrupting an answer of the witness) that "We are only concerned with the trouble set forth in the complaint, September 15, 1942." And, likewise, the closest approach to a ruling on the subject, as to this witness' testimony, is the reply of the trial judge that "Malice is involved in this case—I don't know what the lady is going to say, naturally, but I think that the attitude and relations that existed between the plaintiff here and all her neighbors has more or less to do with this case." The judge's statement was not challenged and no objection was interposed to the succeeding questions. ■■ However, at a later stage of her examination, after she had stated, "and I found three dead rats in front of my doorway," the court interrupted her and the record thereon is as follows: "The Court: Q. You didn't see them [the Zieglers] put them there? A. No, but no one else would throw any rats. The Court: I will accept a motion to strike that. Mr. Penaat [plaintiff's attorney]: Yes. As a matter of fact, I think all of her testimony is irrelevant. The

Court: There are parts of it that have some relevancy to the nature of this case." The ruling, if we may call it such, was correct.

Plaintiff argues, however, that the judgment must be reversed by reason of the admission and consideration by the court of the above mentioned testimony concerning specific instances of interference by plaintiff and her husband with the neighbors, and in this connection urges that although in an action for malicious prosecution proof of bad reputation of plaintiff for peace and quiet is admissible on various theories, such proof must consist of evidence of general reputation rather than of specific acts of plaintiff. But here the admissibility of the evidence in question is not governed by the rules pertaining to the proof of bad reputation. Such evidence was admissible because it tended to throw light on the relationship of the parties to each other or to their neighbors who were witnesses. It related generally to subject matter concerning which plaintiff had testified and was pertinent to the issue of malice. The action before the court obviously grew out of a neighborhood quarrel, apparently a more or less continuing quarrel, and the joint effort of a substantial number of the neighborhood residents to have the plaintiff and her husband placed under a peace bond. Mrs. Saran testified, "That wasn't the only day we had trouble. Every day something happened there." The specific acts testified to were not wholly disconnected incidents with strangers but rather a part of the background of the very controversy at issue. If plaintiff's testimony concerning the specific acts of herself and her husband in relation to their neighbors was admissible as a part of the surrounding circumstances, so also was that of the neighbors. "The plaintiff is given a very wide range in proving facts and circumstances tending to prove malice, and the defendant, to disprove it." (16 Cal.Jur. 748, § 15.) The effect of such evidence—whether, in the light of the other evidence, it tended to establish or to negate malice on the part of the defendant—was for the trial court. Under the circumstances there was no error in receiving it.

We have discussed the merits of the question on the admissibility of the above mentioned evidence because the briefs seem to assume that such question is properly before the court, but it should also be mentioned, as a further and in itself sufficient answer to plaintiff's contention on this point, that the record discloses that substantially all of the questioned

evidence (the testimony of Mr. Reuze and of the three other neighbors, as well as that of Mrs. Saran, previously discussed) concerning specific incidents was received without prior specific objection having been interposed (counsel for plaintiff stated his views as to the general scope the evidence should take but did not object to individual questions) and that such motions to strike as were made were so general and inclusive as to require denial even if plaintiff's theory of admissibility had been correct. Furthermore, it should be noted that the subject of proving bad general reputation for peace and quiet was not mentioned until late in the trial, when it was suggested by the learned trial judge, and that when counsel for defendant acted upon the court's suggestion the objection of counsel for plaintiff to the questions asked was based upon the contention that the questions should call for general reputation for "truth and honesty" rather than for "peace and quiet." In his brief counsel for plaintiff now admits, in effect, that the questions severally objected to were in proper form but contends that testimony of specific acts, given in response to other questions not specifically objected to, was improperly admitted because it tended to prove bad reputation. As hereinabove shown such evidence was properly admitted as touching upon the issue of malice.

 In addition to his story as quoted hereinabove Mr. Reuze stated that "They [the Zieglers] went to my employer where I was working and said that I was not fit to be an American Citizen, and then they sent the Immigration Department to investigate me. I have no objection, because I was not afraid to be investigated by anyone; and after that they went where I am working now at the present time; they went there and told the chief of the guards that I am a thief, that I stole some tools from Bethlehem Steel Company . . . And that I threatened [Mrs. Ziegler] . . . with a machine gun. Q. And they tried to get you discharged? A. Yes, that was the idea when they came there, to have me discharged. . . . Q. How do you know that all these annoyances resulted from the activities of these people? . . . A. Because the chief of the guards . . . told me about it himself." Counsel for plaintiff asked that "this latter testimony" be stricken as hearsay, to which the trial judge replied, "Yes, but it still produces a certain amount of effect in my mind." Assuming that the motion is sufficiently certain in its specification of testimony to be understandable alike by counsel, the trial court, and this court, the ruling

striking the hearsay was correct and, being stricken, it was the duty of the trial judge to completely disregard it. We are satisfied, however, for reasons hereinafter delineated, that a reversal cannot be predicated on the remark "but it still produces a certain amount of effect in my mind."

Apparently before the defendants had rested, but without objection from either party, the judge brought the trial to a conclusion by announcing his decision as follows: "I will decide this case without further testimony. I have heard plenty. *The testimony of the plaintiff herself and her husband is sufficient* to indicate to me that there is no basis for the prosecution of this action for damages for false arrest. *The testimony of all the witnesses* shows that the condition of strife and neighborhood quarrelsomeness existing up there on the hill is created by the fact that the plaintiff and her husband seem to figure that they had control of the destinies of everybody in that neighborhood up there. . . . They have this WPA worker taken off his job, and they make half a dozen or more complaints against the maintenance of conditions that are in various homes up there. . . . *But, anyway, this lady didn't seek a warrant for the arrest of the plaintiff. There was a general conference . . . at the Bond and Warrant office as between the plaintiff and all these other neighbors . . .*" (Italics added.) The trial court specifically found, among other things, "That defendant, in or by the obtaining of said warrant [of September 26, 1942, against plaintiff], did not act maliciously or without probable cause, but did so on the advice of a deputy district attorney of said City and County [of San Francisco] after having stated to him the facts of her complaint against plaintiff."

Plaintiff argues vigorously that the statement by the trial judge upon striking the hearsay testimony of defendant's husband, quoted hereinabove, that such testimony "still produces a certain amount of effect in my mind," demonstrates that the judge was allowing himself to be influenced by inadmissible evidence. Giving consideration to the entire record, as we are required to do by the provisions of section 4½ of article VI of the California Constitution, we are satisfied that the hearsay statement, even if it had not been stricken out, could not in reason be regarded as of sufficient moment to have any substantial effect upon the trial court's findings. The evidence taken as a whole leads overwhelmingly to the conclusion that there has been no miscarriage of justice by the

entry of judgment in defendant's favor. As testified by plaintiff, herself, as well as by defendant, her husband, and the neighbors, the issuance of the complaint against plaintiff came as the culmination of a conference between the deputy district attorney and the neighborhood residents, including the plaintiff and her husband as well as the defendant. The defendant was not learned in court procedures; prior to her appearance on the charge against plaintiff she had never been in court. The trial judge evidently believed that the defendant and her neighbors sought to have the plaintiff and her husband placed under a peace bond, rather than prosecuted for disturbing the peace; and that there was reasonable and probable cause for their action. In any event, the evidence establishes without substantial contradiction that defendant in good faith signed the complaint upon advice of the district attorney or one of his deputies after a full and fair disclosure of all the facts. The court specifically found, among other things, that defendant acted upon such advice and, as previously mentioned, that she acted without malice and upon probable cause. Several complete defenses to this malicious prosecution action are thus made out by defendant. Regardless of the other issues, the finding as to defendant's receipt of and reliance upon the advice of counsel (see 16 Cal.Jur. 741 § 11; *Richter* v. *Neilson* (1936), 11 Cal.App.2d 503, 508 [54 P.2d 54]; *Sebastian* v. *Crowley* (1940), 38 Cal.App.2d 194, 203 [101 P.2d 120]) could not well have been affected adversely to plaintiff by the stricken hearsay testimony. Under the circumstances the erroneous consideration by the trial court of the stricken testimony, assuming that such testimony was considered, must be held not to have resulted in a miscarriage of justice. (See Cal. Const., art. VI, § 4½; Code Civ. Proc., § 475.) And under the same rule, even if it could be held that the evidence (hereinabove discussed) concerning the specific acts of plaintiff and her husband was improperly considered for any purpose, the judgment could not be disturbed.

For the reasons above stated, the judgment is affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Spence, J., concurred.

Appellant's petition for a rehearing was denied January 10, 1946.